JEFFREY F. YEE (SBN 193123)
yeej@gtlaw.com
GREENBERG, TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone: (310) 586-3846
Facsimile: (310) 586-1346

RICARDO A. GONZALEZ (*Pro Hac Vice* pending)
gonzalezr@gtlaw.com
JONATHAN J. RODRIGUEZ (*Pro Hac Vice* pending)
rodriguezjo@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Ave, Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Attorneys for Plaintiffs*
STANCHART SECURITIES INTERNATIONAL,
INC., STANDARD CHARTERED INTERNATIONAL
(USA) LTD., and STANDARD CHARTERED
INTERNATIONAL (AMERICAS) LTD.

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION**

| | |
|---|---|
| STANCHART SECURITIES INTERNATIONAL, INC., STANDARD CHARTERED INTERNATIONAL (USA) LTD., and STANDARD CHARTERED INTERNATIONAL (AMERICAS) LTD., <br><br> Plaintiffs, <br><br> v. <br><br> SERGIO GAVALDON, ANGELICA GAVALDON, S&A INVESTMENTS, INC., and HARLEY INVEST LTD., <br><br> Defendants. | CASE NO. 3:12-cv-2522-LAB-MDD <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................1

**BACKGROUND** ......................................................................3

    **A. The Alleged Recommendations Upon Which Defendants' Claims Are Based**................3

      1. The Alleged Recommendations to Invest in Fairfield Sentry Fund ...................4

      2. The Alleged Recommendations to Invest in the GEMSTB Fund ......................4

      3. The Alleged Recommendation to Finance the Purchase of the Life Insurance Policy .....4

      4. The Alleged Recommendation to Use "Leverage" in S&A's and Harley's Accounts.......4

    **B. The Relevant Account Agreements and Arbitration Provisions** .....................5

      1. S&A and Harley Sign Account Applications and Agreements with SCBI ................5

      2. S&A and Harley Sign Brokerage Agreements with SCBI ..........................6

      3. Harley Signs a Nondiscretionary Investment Services Agreement with SCBI ..........6

      4. SCSI Is Formed and the SCSI Brokerage Agreement Is Issued to S&A and Harley .......7

    **C. The SCSI Brokerage Agreement Is Declared "Unconscionable" and Likely Invalid** ......9

    **D. The FINRA Arbitration**.........................................................11

**ARGUMENT** .......................................................................12

    **A. The Court Determines Arbitrability** ...........................................12

    **B. The Court Should Issue a TRO and a Preliminary Injunction**.......................14

      1. Plaintiffs Are Likely To Succeed on the Merits ...............................15

        (a) *The Gavaldons Cannot Compel Arbitration Against Any of the Plaintiffs* ...........16

        (b) *None of the Defendants Can Compel Arbitration Against SCI*...............17

        (c) *None of the Defendants Can Compel Arbitration Against SCBI* ...........17

        (d) *None of the Defendants Can Compel Arbitration Against SCSI*...............18

      2. Plaintiffs Will Suffer Irreparable Harm Without a TRO or a Preliminary Injunction.......23

      3. The Balance of the Equities Tips Sharply in Favor of the Plaintiffs .................24

      4. The Issuance of a TRO and a Preliminary Injunction is in the Public Interest .................24

    **C. The Court Must Sever and Enjoin Those Claims That Are Not Arbitrable**................25

    **D. Plaintiffs Should Not Be Required To Post A Bond** ..............................25

**CONCLUSION** ....................................................................25

i

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alan v. Superior Court*, 111 Cal. App.4th 217 (2003) ...................................................... 17, 18

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................... 15

*Alvarez v. T-Mobile USA, Inc.*, 2011 WL 6702424 (E.D. Cal. Dec. 21, 2011) ........................ 15

*AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643 (1986) ........................ 24

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996 (9th Cir. 2010) ...... 12

*Brookstreet Sec. Corp. v. Bristol Air, Inc.*, 2002 U.S. Dist. LEXIS 16784 (N.D. Cal. 2002) ....... 14

*Chiron Corp. v. Ortho Diag. Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000) ................................ 15

*Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16 (2d Cir. 1995) ............ 25

*Comer v. Micor, Inc.*, 436 F.3d 1098 (9th Cir. 2006) ........................................................... 15

*Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796 (N.D. Cal. 2004) ....................................... 15

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ..................................... 12, 13

*Franklin v. L.E. Scribner*, 2007 WL 1491100 (S.D. Cal. 2007) ........................................... 14

*Goldman Sachs & Co. v. Becker*, No. C-07-01599, 2007 WL 1982790 (N.D. Cal. July 2, 2007) .......... 14

*Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000) ...................................... 15

*Gruntal & Co., Inc. v. Steinberg*, 837 F. Supp. 85 (D. N.J. 1993) .................................. 14, 23

*Halley Optical Corp. v. Jagar Intern. Mkting. Corp.*, 52 F. Supp. 638 (S.D.N.Y 1990) ........ 14

*Herbert J. Sims & Co. v. Roven*, 548 F. Supp.2d 759 (N.D. Cal. 2008) ............................... 14

*Hornor, Townsend & Kent, Inc. v. Hamilton*, 2005 WL 5895396 (N.D. Ga. 2005) ............... 22

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002) ............................................... 12

*Indep. Living Ctr. Of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644 (9th Cir. 2009) ............... 15

*Lydon v. Boston Sand & Gavel Co.*, 175 F.3d 6 (1st Cir. 1999) .......................................... 13

*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458 (9th Cir. 1983) ........... 25

*Merrill Lynch Inv. Mgrs. v. Optibase Ltd.*, 337 F.3d 125 (2d Cir. 2003) ............................. 23

*Miguel Calvo, et al. v. Standard Chartered Bank Intl. (Americas) Ltd., et al.*,

   No. 50 148 T 00508 09 (ICDR 2010) ............................................................................... 9

*Oppenheimerfunds Distributor, Inc. v. Liska*, 2011 WL 5984036 (S.D. Cal. Nov. 28, 2011) .......... 14, 24

*Paine Webber, Inc. v. Hofmann*, 984 F.2d 1372 (3d Cir. 1993) .......................................... 25

ii

## TABLE OF AUTHORITIES

*Provencio v. WMA Securities, Inc.*, 125 Cal. App.4th 1028 (2005) ........................................................ 18

*Prudential Sec., Inc. v. Dusch*, No. 931470-IEG (RBB),

    1994 WL 374425 (S.D. Cal. Mar. 28, 1994) ...................................................................... 20

*Riccard v. Prudential Ins. Co.*, 307 F.3d 1277 (11th Cir. 2002) ......................................................... 19

*Sierra On-Line  v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir. 1984) .............................................. 15

*Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999) ........................................................... 15

*Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. Sys. Co.*,

    643 F.2d 863 (1st Cir. 1981) ...................................................................... 14

*Standard Chartered Bank International (Americas) Ltd., et al. v. Miguel Calvo, et al.*,

    No. 10-cv-04684 (S.D.N.Y.) ...................................................................... 9

*Sykes v. Escueta*, No. 10-3858, 2010 WL 4942608 (N.D. Cal. Nov. 29, 2010) ........................... 23, 24

*Textile Unlimited, Inc. v. A.BMH & Co., Inc.*, 240 F.3d 781 (9th Cir. 2001) ....................................... 23

*Wachovia Sec., LLC v. Raifman*, 2010 WL 45026360 (N.D. Cal. 2010) ........................ 14, 16, 17, 23, 24

*Wheat, First Sec. v. Green*, 993 F.2d 814 (11th Cir. 1993) ...................................................... 19

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ...................................................................... 15

*World Group Sec. v. Tiu*, No. CV 03-2609-NM, 2003 WL 26119461 (C.D. Cal. July 22, 2003) ........... 19

*Zaidi v. New York Bldg. Contractors, Ltd.*, 2012 WL 4513168 (N.Y. App. Div. Oct. 3, 2012) ............. 17

**RULES**

Federal Rule of Civil Procedure 65 ...................................................................... 1

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

**PRELIMINARY STATEMENT**[1]

Plaintiffs, by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 65 and this district's Local Rules, respectfully request that this Court issue a temporary restraining order ("TRO") to immediately restrain Defendants, Sergio and Angelica Gavaldon, S&A Investments Inc. ("S&A"), and Harley Invest Ltd. ("Harley"), from proceeding against Plaintiffs in the arbitration styled, *In the Matter of Arbitration Between: Sergio Gavaldon, et al. v. StanChart Securities International, Inc., et al.*, FINRA Case No. 10-05385 (the "FINRA Arbitration"), until Plaintiffs' Motion for Preliminary Injunction has been decided. Plaintiffs also request the entry of an Order preliminarily enjoining the Defendants from proceeding against the Plaintiffs in the FINRA Arbitration.

Plaintiffs have no choice but to seek a TRO because a final evidentiary hearing on the merits of Defendants' Amended Statement of Claim ("SOC")[2] is set to commence in just a few days, on ***October 25, 2012***. Defendants are improperly attempting to force Plaintiffs to arbitrate claims which either are *not* subject to an arbitration agreement or are *not* required to be arbitrated by *any* of the Plaintiffs under the FINRA Code of Arbitration Procedure for Customer Disputes (the "FINRA Code"). The tribunal of arbitrators (the "Tribunal") previously denied Plaintiffs' motion to dismiss ("MTD") the SOC, without prejudice. Now, the Tribunal apparently has decided to defer any ruling on Plaintiffs' renewed request for dismissal until *after* the final evidentiary hearing on the merits. By then, it will be too late to remedy the irreparable harm to the Plaintiffs, all of which will have been forced to participate in an arbitration proceeding (i) initiated by individuals and entities with no contractual or legal right to compel arbitration of the asserted claims under the FINRA Code; (ii) on claims that the Plaintiffs are not contractually or legally required to arbitrate in FINRA; and (iii) before a FINRA Tribunal with no jurisdiction over the parties' dispute. Those factors constitute irreparable harm *as a matter of law*. The undersigned has conferred with Defendants' counsel, who has indicated that Defendants will not agree to a stay of the FINRA Arbitration pending the resolution of Plaintiffs' Motion for Preliminary Injunction. Earlier this evening, the undersigned counsel received an order apparently entered by the

---

[1]   Contemporaneously filed with the instant Memorandum is the Declaration of Ricardo A. Gonzalez, Esq. (the "Gonzalez Decl.") to which true and correct copies of the exhibits cited throughout this Memorandum are attached.
[2]   A true and correct copy of the SOC is attached to the Gonzalez Decl. as **Exhibit "A."**

1

Tribunal on October 18, 2012, in which the Tribunal *denied* Plaintiffs' request to stay the FINRA Arbitration "unless granted by U.S. District Court."[3] Because the FINRA Arbitration final evidentiary hearing is set to commence *before* the time the Motion for Preliminary Injunction is to be fully-briefed, Plaintiffs have no reasonable alternative but to request the entry of a TRO that will preserve the status quo until a final determination of the Motion for Preliminary Injunction can be made by this Court.

Defendants, Sergio Gavaldon and Angelica Gavaldon (collectively, the "Gavaldons"), are former private banking customers of SCBI (f/k/a American Express Bank International ("AEBI")). The Gavaldons invested and borrowed money through certain nondiscretionary investment accounts maintained by Defendants, S&A and Harley, at SCBI. S&A and Harley are Cayman Island trust entities established for the specific purpose of investing and borrowing money through accounts at SCBI. In the SOC, Defendants allege that they have lost approximately $4 million as a result of Plaintiffs' unsuitable, negligent, and/or fraudulent investment recommendations.[4]

In an attempt to recoup these alleged losses, Defendants initiated the FINRA Arbitration against SCI, SCBI, and SCSI; however, as described in greater detail throughout this Memorandum, Defendants' claims are not arbitrable before the Tribunal, because:

- None of the Plaintiffs has consented to arbitrate this dispute before FINRA;

- Neither Mr. Gavaldon nor Mrs. Gavaldon signed an arbitration agreement with any of the Plaintiffs, nor can either of them compel arbitration against any of the Plaintiffs, absent an agreement as a "customer" of the Plaintiffs pursuant to Rule 12200 of the FINRA Code;

- SCI is not a signatory to an arbitration agreement with any of the Defendants, nor has it ever been a member of FINRA. Accordingly, SCI cannot be required to arbitrate Defendants' claims under Rule 12200 of the FINRA Code;

- Although, SCBI signed arbitration agreements with S&A and Harley (but not the Gavaldons), those agreements require arbitration in accordance with the rules of the American Arbitration Association ("AAA"). In addition, like SCI, SCBI is not now, nor has it ever been, a member of FINRA, and, thus, is not required to arbitrate Defendants' claims under Rule 12200 of the FINRA Code; and

- Although SCSI is a signatory to arbitration agreements with S&A and Harley (but not the Gavaldons) that purport to require FINRA arbitration, those agreements have previously been declared "unconscionable" by a tribunal of the AAA and most likely

---

[3] **Exhibit "II,"** Order Denying Respondents' Motion for Stay of Arbitration Pending Federal District Court Action, FINRA Arbitration (received on October 22, 2012).
[4] **Exhibit "A,"** SOC, p.1.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

invalid by a federal district court. Nevertheless, to the extent the agreements are valid, they do not provide any basis to require SCSI to arbitrate before FINRA, because none of the Defendants was a "customer" of SCSI or an "associated person" of SCSI at the time the alleged unsuitable, negligent, and/or fraudulent investment recommendations were purportedly made to the Gavaldons. Moreover, the parties' dispute cannot possibly arise in connection with the business activities of a FINRA member or an "associated person" of the FINRA member, as required under Rule 12200 of the FINRA Code, because, again, SCSI was not a member of FINRA when the alleged recommendations and investments were purportedly made.

The Court thus should enter both a TRO and a preliminary injunction, enjoining Defendants from proceeding against Plaintiffs in the FINRA Arbitration.

Plaintiffs amply meet the criteria for the issuance of a TRO and a preliminary injunction. *First*, Plaintiffs are *very* likely to succeed on the merits. Plaintiffs submit that all claims by all Defendants against all Plaintiffs should be enjoined. However, even if some claims ultimately prove to be arbitrable – a conclusion not supported by the evidence and controlling legal authority – the Court must nonetheless sever and enjoin arbitration of those claims which clearly are not arbitrable. *Second*, the immediate and irreparable injury that Plaintiffs would suffer by being forced to arbitrate claims they do not agree to arbitrate and are not required to arbitrate is established as a matter of law. *Third*, the balance of hardships tips decidedly in Plaintiffs' favor. *Fourth*, the public interest would be advanced by not forcing Plaintiffs to arbitrate disputes they never agreed to arbitrate and/or cannot be required to arbitrate. Accordingly, the Court should issue a TRO immediately staying the FINRA Arbitration and a preliminary injunction enjoining the Defendants from proceeding against the Plaintiffs in the FINRA Arbitration, pending the resolution of Plaintiffs' Complaint for Declaratory and Injunctive Relief.

## BACKGROUND

### A.   The Alleged Recommendations Upon Which Defendants' Claims Are Based.

The FINRA Arbitration arises out of certain alleged unsuitable, negligent, and/or fraudulent investment recommendations by the Plaintiffs, which Defendants contend caused them to suffer losses in excess of $4 million. Defendants allege that the investments and loans at issue were recommended by the relationship managers ("RMs") and/or investment specialists ("ISs") assigned to S&A's and Harley's nondiscretionary investment accounts.[5] The RMs and ISs were employees of SCBI, and, at all

---

[5] *See* **Exhibit "B,"** Claimants' Prehearing Brief ("Cl. Prhrg. Br."), pp. 2, 9-13 (describing investments and loans).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

times relevant herein, acted on SCBI's behalf on the accounts and transactions at issue. The investments and loans in question were always held in Defendants' nondiscretionary investment accounts at SCBI.[6]

> 1.    The Alleged Recommendations to Invest in Fairfield Sentry Fund.

Defendants allege that Carlos Gadala-Maria ("Gadala-Maria"), an RM who serviced S&A's and Harley's accounts between approximately March 1, 2002 and June 30, 2007, first recommended Fairfield Sentry to the Gavaldons in February 2004.[7] Allegedly, on the basis of that recommendation, S&A and Harley invested $1 million and $600,000, respectively, in or around March 2004, in Fairfield Sentry through their accounts at SCBI.[8] Furthermore, Defendants allege that the subsequent investment of $500,000 and $300,000 in Fairfield Sentry by S&A and Harley, respectively, in January 2008, was based on the recommendation of Luisa Serena, an RM later assigned to S&A's and Harley's accounts.[9]

> 2.    The Alleged Recommendations to Invest in the GEMSTB Fund.

On the GEMSTB Fund, Defendants allege that S&A and Harley first invested in the fund in June 2005 on the basis of Gadala-Maria's recommendation.[10] Defendants also allege that S&A's and/or Harley's later purchases of fund shares (in September 2006, January 2007, June 2007, and January 2008) all were made upon the advice and recommendations of their RMs and/or the ISs at SCBI.[11]

> 3.    The Alleged Recommendation to Finance the Purchase of the Life Insurance Policy.

The Gavaldons allege that, in late-2003, Gadala-Maria recommended the purchase of a $10 million life insurance policy for Angelica Gavaldon. According to the Gavaldons, on Gadala-Maria's recommendation, they borrowed $3,595,000 from SCBI in August 2003 to pay the initial premium for the insurance policy.[12]

> 4.    The Alleged Recommendation to Use "Leverage" in S&A's and Harley's Accounts.

---

[6] *See* **Comp. Exhibit "C,"** Account Statements ("Acct. Stmts.") for S&A; **Comp. Exhibit "D,"** Acct. Stmts. for Harley; **Exhibit "HH,"** Sept. 2006, Jan. 2007 Acct. Stmts. for Harley.
[7] *See* **Exhibit "B,"** Cl. Prhrg. Br., pp. 6-7, 9-11.
[8] *See* **Exhibit "B,"** Cl. Prhrg. Br., pp. 9-11; **Comp. Exhibit "C,"** S&A Acct. Stmts.; **Comp. Exhibit "D,"** Harley Acct. Stmts.; **Exhibit "HH,"** Sept. 2006 and Jan. 2007 Harley Acct. Stmts.; **Composite Exhibit "E,"** Contract Notes.
[9] *See* **Exhibit "B,"** Cl. Prhrg. Br., pp. 9-11; **Comp. Exhibit "C,"** S&A Acct. Stmts.; **Comp. Exhibit "D,"** Harley Acct. Stmts.; **Exhibit "HH,"** Sept. 2006 and Jan. 2007 Harley Acct. Stmts.
[10] *See* **Exhibit "B,"** Cl. Prhrg. Br., pp. 11-13; **Comp. Exhibit "C,"** S&A Acct. Stmts.; **Comp. Exhibit "D,"** Harley Acct. Stmts.; **Exhibit "HH,"** Sept. 2006 and Jan. 2007 Harley Acct. Stmts.
[11] *See* **Exhibit "B,"** Cl. Prhrg. Br., pp. 11-13; **Comp. Exhibit "C,"** S&A Acct. Stmts.; **Comp. Exhibit "D,"** Harley Acct. Stmts.; **Exhibit "HH,"** Sept. 2006 and Jan. 2007 Harley Acct. Stmts.
[12] *See* **Exhibit "B,"** Cl. Prehrg. Br., pp. 13-14; **Comp. Exhibit "F,"** Call report dated July 10, 2003 and related documents.

4

The Gavaldons further allege that, beginning in 2002, on the advice of the RMs and ISs assigned to S&A's and Harley's accounts, they borrowed millions of dollars in loans through S&A's and Harley's accounts.[13] In total, SCBI made five (5) separate loans to the Gavaldons: three (3) loans through S&A's account in January 2003 (LD02119003); March 2005 (LD050630004); and April 2005 (LD0511500005); and three (3) loans through Harley's accounts in January 2003 (LD0211900002); October 2004 (LD041200007); and March 2005 (LD05160002).[14]

The dates of the securities and loan transactions that Defendants claim were negligently, or fraudulently recommended by Plaintiffs, are be summarized in the table below.

|  | **S&A**<br>(Acct. # 15548-1) | **Harley**<br>(Accts. # 16053-1 & 103217-1) | **A.G. L. Insurance Trust**<br>(Acct. # 102697-1) |
|---|---|---|---|
| **Fairfield Sentry Fund** | March 2004<br>January 2008 | March 2004<br>January 2008 | N/A |
| **GEMSTB Fund** | June 2005<br>September 2006<br>January 2007<br>June 2007<br>January 2008 | June 2005<br>September 2006<br>January 2008 | N/A |
| **Life Insurance Loan** | N/A | N/A | August 2003 |
| **Other Loans** | January 2003<br>March 2005<br>April 2005 | January 2003<br>October 2004<br>March 2005 | N/A |

As described in greater detail below, Defendants' claims are not arbitrable before FINRA, because, at the time the securities and loans in question were allegedly recommended by the Plaintiffs, none of the Plaintiffs, including SCSI, was a member of FINRA.

**B.   The Relevant Account Agreements and Arbitration Provisions.**

1.   S&A and Harley Sign Account Applications and Agreements with SCBI.

S&A and Harley opened nondiscretionary investment accounts with SCBI on May 15, 1997 and March 16, 2004, respectively. In connection with their accounts, S&A and Harley each executed an Account Application and Agreement for Corporation or Other Organization (the "Account Application and Agreement"), pursuant to which they agreed to be bound by all of its terms and by the "'Rules and

---

[13] *See* **Exhibit "B,"** Cl. Prehrg. Br., p. 15.
[14] **Comp. Exhibit "C"** S&A Acct. Stmts.; **Comp. Exhibit "D,"** Harley Acct. Stmts.; **Exhibit "HH,"** Sept. 2006 and Jan. 2007 Harley Acct. Stmts.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

1 Regulations Governing Accounts' (as amended from time to time), which are incorporated [in the

2 Account Application and Agreement]."[15] Both the Account Application and Agreement and the Account

3 Rules and Regulations state that they are governed by and shall be construed in accordance with the

4 laws of the State of Florida and any applicable federal law.[16]

5        2.     <u>S&A and Harley Sign Brokerage Agreements with SCBI.</u>

6        S&A and Harley also executed an Application for Brokerage Account and Client Agreement (the

7 "AEBI Brokerage Agreement").[17] That AEBI Brokerage Agreement provides various terms and

8 conditions governing the relationship between SCBI and S&A and Harley, including:

9     • ***Arbitration.*** Paragraph 6 provides, *inter alia,* that SCBI and Defendants agree to
10        arbitrate disputes arising out of, or relating to S&A's and Harley's accounts, or to
       transactions with SCBI or SCBI's employees pursuant to the Federal Arbitration Act
11        (the "FAA"), before the American Arbitration Association or the National
       Association of Securities Dealers Inc., Chicago Stock Exchange Inc., the New York
       Stock Exchange, the American Stock Exchange, to the extent SCBI may be a
12        member of such exchange.[18]

13     • ***Amendments.*** Paragraph 8 states that Defendants agree that (1) SCBI has the right to
       make amendments that modify, rescind or add to the provisions of the AEBI
14        Brokerage Agreement, (2) those amendments can be made retroactively, (3) the
       "agreement is not subject to oral modification;" (4) when SCBI makes an
15        amendment, the notice requirement can be fulfilled "by mailing a written notice or a
       new printed agreement" to the customer, and that a customer's "use of the Account
16        after delivery of notice of the change constitutes my agreement to be bound thereby;"
       and (5) the agreement and other documentation signed by the customer, constitutes
17        the entire agreement between the customer and SCBI.[19]

18        3.     <u>Harley Signs a Nondiscretionary Investment Services Agreement with SCBI.</u>

19        Harley also executed a Nondiscretionary Investment Services Agreement ("NISA").[20] The NISA

20 provides that, *inter alia*, Harley's account and the NISA are governed by and shall be construed in

21 accordance with the laws of the State of Florida. In addition, the NISA provides other terms and

22 conditions governing the relationship between Harley and SCBI, including the following provisions:

23     • ***Arbitration of Controversies.*** "Customer and AEBI agree that all controversies
       between Customer and AEBI and/or any Agent arising out of or concerning this
24        Agreement, the Investment Account, Transactions, Holdings or any related matter

25

---

26 **[15] Composite Exhibit "G,"** S&A Acct. Appl. and Agrmt. ¶¶5(a), 14; Harley Acct. Appl. and Agrmt. ¶¶5(a), 14.
  [16] **Comp. Exhibit "G,"** S&A Acct. Appl. and Agrmt. ¶13; Harley Acct. Appl. and Agrmt. ¶13.
27   [17] **Composite Exhibit "H,"** S&A's AEBI Brokerage Agreement ; Harley's AEBI Brokerage Agreement.
  [18] **Comp. Exhibit "H,"** S&A's AEBI Brokerage Agreement ¶ 6; Harley's AEBI Brokerage Agreement ¶ 6.
28   [19] **Comp. Exhibit "H,"** S&A's AEBI Brokerage Agreement ¶ 8; Harley's AEBI Brokerage Agreement ¶ 8.
  [20] **Exhibit "I,"** NISA.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

shall be determined by arbitration in accordance with the American Arbitration Association. Any arbitration proceeding between AEBI and Customer shall be held in Miami-Dade County, Florida."[21]

- **Entire Agreement.** No Oral Changes or Amendments; Amendments by AEBI. This Agreement represents the entire agreement of the parties with respect to the matters contained herein and may not be amended or terminated except in writing signed by AEBI. Notwithstanding the foregoing, AEBI reserves the right to amend the terms and conditions set forth in this Agreement at any time. AEBI shall provide notice of any such amendment or change to Customers by mail, and all such amendments and changes shall take effect, with respect to the Investment Account, 30 days after the date on which such notice is mailed or any later dated specified in the notice . . . .[22]

- **Conflict with other Account Agreements and Documentation. "**This Agreement is intended to be read and applied in conjunction with the other account agreements and other documentation entered into by or applicable to Customer; however, in the event and to the extent there is any conflict or inconsistency between the provisions of this Agreement and such other agreements and documentation, the provisions of this Agreement shall control as to the Investment Account."[23]

4.    SCSI Is Formed and the SCSI Brokerage Agreement Is Issued to S&A and Harley.

On or about October 1, 2008, SCBI sent a letter (the "October 2008 Letter") to its customers, including S&A and Harley, announcing that, effective on November 7, 2008 (the "Transfer Date"), certain investment accounts at SCBI would be transferred to SCSI, a newly-formed, but not yet operational, broker-dealer affiliate.[24] The October 2008 Letter indicated that if the customer had "signed an existing brokerage account application and agreement with SCBI (which may reference American Express Bank International . . .), that agreement will remain in effect and continue to serve as your brokerage account application and agreement with StanChart Securities [i.e., SCSI], except that the account agreement will be (and is hereby) amended effective on the Transfer Date to provide that it is governed by New York law rather than Minnesota law."[25]

As described in the October 2008 Letter, the migration of customers' investment accounts from SCBI to SCSI was precipitated by the Gramm-Leach-Bliley Act of 1999 (the "GLBA") and its implementing regulation, Regulation R.[26] Prior to the GLBA, banks in the United States, such as SCBI,

---

[21] **Exhibit "I,"** NISA at ¶ 9(a).
[22] **Exhibit "I,"** NISA at ¶ 9(c).
[23] **Exhibit "I,"** NISA at ¶ 9(e).
[24] **Composite Exhibit "J,"** Letter to S&A from Fernando Iglesia, COO, SCBI, dated October 1, 2008, and Letter to Harley from F. Iglesia, COO, SCBI, dated October 1, 2008 (the "October 1, 2008 Letters")
[25] **Comp. Exhibit "J,"** October 1, 2008 Letters.
[26] **Comp. Exhibit "J,"** October 1, 2008 Letters.  *See* Regulation R, 72 Fed. Reg. 56,514 (Oct. 3, 2007) (Regulation R is codified in the SEC's regulations at 17 C.F.R. Part 247.700 *et seq.*, and the FRB's regulations at 12 C.F.R. Part 218.700 *et seq.*)); *see also* Exch. Act Rel. No. 56,501 (Sep. 24, 2007) (Joint Release by the Securities and Exchange Commission (SEC) and Federal Reserve System (FRB) 2007-198, dated September 24, 2007 (the "Adopting Joint Release).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

enjoyed a "blanket" exclusion from the definition of "broker" under the Securities and Exchange Act of 1934 (the "Exchange Act"). The GLBA replaced the "blanket" exclusion for banks from the definition of "broker" with specific functional exceptions that are largely based on the capacity in which the bank is acting or the type of securities involved in the bank's activity. Pursuant to the GLBA, to the extent that a bank intends to engage in securities activities which do not fall under one or more of the GLBA's functional exceptions, the bank is required either to register with the SEC as a broker-dealer or "push out" the securities activities to an affiliated or third party SEC-registered broker-dealer.

SCSI (formerly, American Express International Securities, Inc. ("AEIS")) was formed on July 26, 2007, to facilitate SCBI's compliance with the impending regulations.[27] SCSI would eventually become the broker-dealer to which SCBI would "push out" certain of its securities activities in accordance with the GLBA. Soon after it was formed, AEIS began the process of applying for the requisite state and federal securities licenses, as well as membership in FINRA[28] for itself and certain employees of SCBI whom SCSI eventually would employ.[29]  SCSI was notified on February 11, 2008, that its application for membership in FINRA had been accepted contingent upon the execution of a membership agreement by SCSI.[30] On February 29, 2008, SCSI officially became a FINRA member.[31] From the time of its formation, on July 26, 2007, until it began operating on November 5, 2008, SCSI did <u>not</u> engage in or conduct any securities business activities.[32]

On or about April 1, 2009, after SCSI had been in operation for several months, SCSI sent S&A and Harley a letter (the "Retroactive Letter") enclosing a copy of the StanChart Securities International Inc. Brokerage Client Agreement (the "SCSI Brokerage Agreement").[33] The Retroactive Letter

---

[27] **Exhibit "K,"** State of Florida Incorporation documents for SCSI, including Articles of Incorporation; *see also* **Exhibit "GG,"** Decl. of Catalina Cadavid.

[28] **Exhibit "L,"** Letter from Susan Barbazon Wallace of FINRA to Rodolfo Pages, President of AEIS, re: questions raised in connection with AEIS' application for registration (the "Membership Reg. Letter").

[29] NASD Rule 1031 permits a broker-dealer to sponsor an individual for registration in preparation of having such person engage in the securities business on behalf of such member. *See* **Exhibit "L,"** Membership Reg. Letter.

[30] **Exhibit "M,"** Letter from Brian Hartmann of FINRA to Rodolfo Pages, President of AEIS dated February 11, 2008 re: FINRA's decision on application for membership.

[31] **Exhibit "N,"** Broker Check Report for SCSI, p. 8.

[32] **Exhibit "O,"** No "Securities Sales Activity Statement" (by Rodolfo Pages to FINRA) (w/fax cover sheet) and the No "Securities Sales Activity Statement" (by Rodolfo Pages to FINRA) (w/fax cover sheet from Howard B. Landers (1st Bridge house Consulting).

[33] **Comp. Exhibit "P,"** Retroactive Letter from Jay Costello, COO, StanChart Securities International, Inc. dated April 1, 2009 and the StanChart Securities International, Inc. Brokerage Client Agreement.

8

indicated that the SCSI Brokerage Agreement "became effective on November 5, 2008, replacing any previous versions of that agreement." Furthermore, the Retroactive Letter stated that the SCSI Brokerage Agreement, "along with the Brokerage Account Application and any other agreements you have signed, constitutes the entire agreement between you and us."[34] The Retroactive Letter also advised that any "documentation applicable to your investment accounts at Standard Chartered Bank International (Americas) Ltd. [*i.e.,* SCBI] remains in effect and applies equally to your investment account(s) with us."[35] The SCSI Brokerage Agreement is governed by the laws of the State of New York and provides, in pertinent part, that "any controversy between you and us shall be submitted to arbitration before any national securities exchange on which a transaction giving rise to the claim took place (and only before such exchange) or the Financial Industry Regulatory Authority [*i.e.,* FINRA]."

**C.    The SCSI Brokerage Agreement Is Declared "Unconscionable" and Most Likely Invalid.**

The claims asserted by the Defendants arising from their investments in Fairfield Sentry are similar to the claims asserted in approximately fifty (50) separate actions pending before the United States District Court for the Southern District of New York and consolidated for pre-trial purposes with *Anwar v. Fairfield Greenwich Group*, No. 09-CV-118 (S.D.N.Y.) (hereinafter, the "Fairfield MDL"), in particular, the cases that name SCBI as a defendant. On or about June 16, 2010, SCSI filed a complaint in the Fairfield MDL in a matter styled, *Standard Chartered Bank International (Americas) Ltd., et al. v. Miguel Calvo, et al.*, No. 10-cv-04684 (S.D.N.Y.) (the "Calvo District Court Action"), seeking declaratory and injunctive relief arising from a then-pending arbitration initiated by former private banking customers of SCBI in the AAA. That arbitration is styled, *Miguel Calvo, et al. v. Standard Chartered Bank Intl. (Americas) Ltd., et al.*, ICDR No. 50 148 T 00508 09 (the "Calvo Arbitration").

The Calvo Arbitration claimants sued SCI, SCSI, SCBI, and an SCB affiliate (collectively, the "Standard Chartered Entities"), as well as a then-current employee and a former employee of SCBI. The claimants purported to compel arbitration before the AAA pursuant to the AEBI Brokerage Agreements. The Standard Chartered Entities objected to the AAA tribunal's jurisdiction over any respondent other than SCBI. The Standard Chartered Entities argued that SCI was not a signatory to any arbitration

---

[34] **Comp. Exhibit "P,"** Retroactive Letter.
[35] **Comp. Exhibit "P,"** Retroactive Letter.

1  agreement with the claimants; that SCSI was not a signatory to the AEBI Brokerage Agreements, and

2  that claimants' relationships with SCSI were governed instead by the SCSI Brokerage Agreement.

3        On or about June 1, 2010, the AAA tribunal entered a partial award on the issue of

4  "jurisdiction."[36] The AAA tribunal granted the Standard Chartered Entities' motion to dismiss SCI from

5  the arbitration, finding that it was not a signatory to any arbitration agreement with the claimants.[37] But,

6  the AAA tribunal denied the Standard Chartered Entities' motion to dismiss SCSI, finding that SCSI

7  was subject to the AAA's jurisdiction pursuant to the AEBI Brokerage Agreement.[38] The AAA tribunal

8  found that because the October 2008 Letter had assigned the AEBI Brokerage Agreement to SCSI, SCSI

9  derived a direct benefit under the AEBI Brokerage Agreement, and therefore, was bound to arbitrate

10  before the AAA..[39] The AAA tribunal rejected SCSI's argument that, pursuant to the Retroactive Letter,

11  SCSI had replaced the AEBI Brokerage Agreement with the SCSI Brokerage Agreement and made the

12  latter retroactive to November 5, 2008. The AAA tribunal found that the retroactive amendment of the

13  arbitration provision to be both procedurally and substantively "unconscionable."[40]

14        Thereafter, SCSI filed a complaint in the Calvo District Court Action seeking declaratory and

15  injunctive relief to prevent the AAA tribunal from proceeding against it in the Calvo Arbitration. The

16  district court denied SCSI's declaratory and injunctive relief motions.[41] Specifically, the district court

17  found that (i) SCSI "unquestionably assumed the AEBI Brokerage Agreement, and thus became bound

18  to AAA arbitration;" and (ii) it was not persuaded that the retroactive amendment of AEBI Brokerage

19  Agreement by the SCSI Brokerage Agreement – which substituted FINRA arbitration in place of AAA

20  arbitration – was proper because their were significant questions concerning the amendment's

21  "unconscionability."[42] The court concluded that SCSI was not likely to prevail in demonstrating that the

22  retroactive imposition of the new arbitration forum in the SCSI Brokerage Agreement was valid.[43]

23

24

---

25  [36] **Exhibit "V,"** Partial Award - Jurisdiction (the "AAA Partial Award"), *Calvo* Arbitration.
    [37] **Exhibit "V,"** AAA Partial Award, at pp. 7-10.

26  [38] **Exhibit "V,"** AAA Partial Award, at pp. 12-15.
    [39] **Exhibit "V,"** AAA Partial Award at pp. 12-13.

27  [40] **Exhibit "V,"** AAA Partial Award, at pp. 13-15.
    [41] **Exhibit "W"** Decision and Amended Order [D.E. 510], *Calvo* District Court Action.

28  [42] **Exhibit "W,"** Decision and Order p. 22, 24-26.
    [43] **Exhibit "W,"** Decision and Order p. 26.

**D.    The FINRA Arbitration.**

In this case, the Defendants purport to compel arbitration against all of the Plaintiffs, including SCSI, pursuant to the SCSI Brokerage Agreement[44] – the same agreements which the AAA tribunal in the Calvo Arbitration found is unconscionable and which the district court in the Calvo District Court Action found was likely invalid. On or about May 12, 2011, Plaintiffs filed an Amended Answer to the SOC (the "Answer").[45] Thereafter, on June 24, 2011, Plaintiffs filed and a motion to dismiss (the "MTD") the SOC pursuant to Rule 12504(a)(6)(B) of the FINRA Code.[46] Rule 12504(a)(6)(B) authorizes a FINRA tribunal to dismiss a claim prior to a hearing on the merits where "the moving party is not associated with the account(s), security(ies), or conduct at issue." FINRA Rule 12504(a)(6)(B). Defendants filed a Response in Opposition to the MTD (the "Opposition to MTD").[47] Defendants argued that, *inter alia*, the issues regarding "the binding nature of the arbitration agreements in the StanChart brokerage account relationship agreements has been decided" by the court in the Calvo District Court opinion.[48] The Defendants attached excerpts of the court's opinion to their Opposition to MTD and urged the Tribunal to follow it.[49]

The Tribunal denied Plaintiffs' MTD, without making any findings or providing any explanation for its decision.[50] The Tribunal stated that the MTD was denied "without prejudice subject to re-filing at a later date if appropriate." The Tribunal also ordered the Plaintiffs to "file Uniform Submission Agreements pursuant to the FINRA Code."[51] However, by executing a USA, a party agrees to submit a dispute to arbitration in accordance with the FINRA bylaws, rules, and FINRA Code.[52] Because Plaintiffs do not consent to arbitration under the FINRA Code and are concerned that the submission of the USAs would be construed as a waiver of their right to contest the arbitrability of Defendants' claims before FINRA, Plaintiffs did not submit the USAs.

On or about April 12, 2012, Defendants filed a motion to compel the submission of the USAs by

---

[44] **Exhibit "A,"** SOC ¶ 38.
[45] **Exhibit "X,"** Respondents' Amended Answer to Amended Statement of Claim.
[46] **Exhibit "Y,"** Respondents' MTD.
[47] **Exhibit "Z,"** Claimants' Opposition to MTD.
[48] *See* **Exhibit "W"** Decision and Amended Order.
[49] *See* **Exhibit "V,"** AAA Partial Award.
[50] **Exhibit "AA,"** Order dated August 16, 2011, FINRA Arbitration ("Order Denying MTD").
[51] **Exhibit "AA,"** Order Denying MTD.
[52] **Exhibit "BB,"** Unexecuted Uniform Submission Agreement.

11

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

1  Plaintiffs. The Tribunal entered an order granting Defendants' motion to compel Plaintiffs to submit

2  executed USAs.[53] Plaintiffs refuse to submit the USAs under any circumstances. At various intervals

3  following the entry of the Order Denying MTD, Plaintiffs have objected to the jurisdiction of the

4  Tribunal. Most recently, on June 29, 2012, Plaintiffs filed a brief again requesting dismissal of the SOC.

5  To date, the Tribunal has not ruled on Plaintiffs' latest request for dismissal, apparently, deferring any

6  ruling until after the final evidentiary hearing on the merits, which is scheduled for October 25, 2012.[54]

7                                            **ARGUMENT**

8  **A.      The Court Determines Arbitrability.**

9         As a preliminary matter, the question of arbitrability is properly before this Court because the

10 Ninth Circuit has held that "the question of arbitrability is for the court to decide." *See Bridge Fund*

11 *Capital Corp. v. Fastbucks Franchise Corp.,* 622 F.3d 996, 998 (9th Cir. 2010).[55] It is anticipated that, in

12 opposition to this motion, Defendants will argue that Plaintiffs have "waived" their right to contest the

13 arbitrability of the SOC before this Court, because Plaintiffs submitted an Answer and/or a MTD in the

14 FINRA Arbitration. To the extent Defendants raise that argument, the Court should reject it outright.

15 *First*, Plaintiffs expressly stated that they were submitting the Answer "without prejudice to their ability

16 to subsequently file a motion to dismiss under FINRA Rule 12504 or to seek relief from a court of law

17 regarding the arbitrability of the SOC."[56] Similarly, in the MTD, Plaintiffs expressly stated:

18 "Respondents do not concede that any decision made by the Panel with respect to the arbitrability of the

19 Statement of Claim will have any binding effect on the Respondents, and reserve the right to seek relief

20 from a court."[57] Furthermore, in order to file the MTD and object to the Tribunal's jurisdiction,

21 Plaintiffs were required to first file an Answer pursuant to FINRA Rule 12504(a)(2), which provides

22 that a motion to dismiss under Rule 12504 "must be filed separately from the answer, and only after the

23 answer is filed." FINRA Rule 12504(a)(2).

24 ---
[53] **Exhibit "CC,"** Order dated June 27, 2012, FINRA Arbitration.
[54] **Exhibit "DD,"** FINRA Notice of Hearing for October 25, 2012.
25 [55] *See also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947 (1995) (holding that threshold considerations about
   arbitrability are subject to independent review by the courts and no deference is due to the arbitral panel's findings unless the
26 parties "clearly agree to submit the issue of arbitrability to arbitration"); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79,
   84 (2002) ("[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of
27 arbitrability' for a court to decide.").
   [56] **Exhibit "X,"** Respondents' Amended Answer to Amended Statement of Claim, FINRA Arbitration, p. 2, n.1.
28 [57] **Exhibit "Y,"** Respondents' Motion to Dismiss Statement of Claim, p. 2, n.1.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

In addition, as indicated previously, threshold considerations about a dispute's arbitrability are subject to independent review by the courts, and no deference is due to the arbitral panel's findings on the matter unless the parties "clearly agree to submit the issue of arbitrability to arbitration." *First Options of Chic.*, 514 U.S. at 947. "[M]erely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.,* a willingness to be effectively bound by the arbitrator's decision on that point. *Id.* at 946. Plaintiffs, by filing a MTD pursuant to FINRA Rule 12504(a)(6)(B), have not indicated a clear willingness to be bound by the Tribunal's Order Denying the MTD. To the contrary, Plaintiffs have continuously objected to the Tribunal's jurisdiction, including, by defying the Tribunal's orders compelling Plaintiffs to submit USAs, and most recently, by renewing their request to dismiss the SOC, which is pending before the Tribunal. Indeed, Defendants filed several motions for sanctions against Plaintiffs in the FINRA Arbitration precisely because Plaintiffs would not submit themselves to FINRA's rules or to the Tribunal's orders.[58] Defendants, having been fully heard in the FINRA Arbitration, should be estopped to argue the opposite position to this Court. *See Lydon v. Boston Sand & Gavel Co.*, 175 F.3d 6, 12-13 (1st Cir. 1999) (finding that the doctrine of judicial estoppel is applicable where the party being estopped has "succeeded previously" in another proceeding "with a position directly contrary to the one it currently espouses").

Finally, Defendants also should be estopped to argue that Plaintiffs should have sought a determination on the issue of the arbitrability of the SOC at the outset of the FINRA Arbitration, given that Defendants have previously taken a contrary position. Specifically, in their Opposition to the MTD in the FINRA Arbitration, Defendants argued, not once, but in *five* separate instances, that a determination regarding the arbitrability of their claims should be considered only *after* the conclusion of discovery.[59] In one such instance, Defendants asserted:

> Respondents essentially ask Claimants to argue in the factual dark, bereft of the totality of information that should be available and *without discovery*. At [sic] very minimum, the premature aspect of this motion bespeaks its impropriety at this *too-early juncture*.

---

[58] *See, e.g.,* **Exhibit "EE,"** Claimants' Brief with Respect to Panel's November 28, 2011 Order at p. 1 (accusing Plaintiffs of "flaunting . . . FINRA rules" and the "panel's direct order"); **Exhibit "FF,"** Claimants' Motion to Compel Discovery and the Filing of Submission Agreements at pp. 1-2 (complaining that Respondents "have not provided any of the mandatory discovery required under FINRA Rule 12506 . . . nor produced any document or provided any written response (or objections) to the document and information requests which Claimants served back on June 16, 2011").

[59] **Exhibit "Z,"** Claimants Opposition to MTD, FINRA Arbitration, pp. 13, 14, 16, 17.

13

> Claimants merely seek to have all the proper parties before this Panel. If Respondents later adequately can substantiate, through discovery and/or at the hearing on the merits, that SCBI, or some other entity, is not a proper party, Claimants will be more than happy to stipulate to its dismissal."[60]

Only three-and-a-half months have elapsed since discovery was concluded in the FINRA Arbitration, with the Tribunal issuing a ruling on Defendants' latest motion to compel on June 27, 2012.[61] Defendants, having previously argued and prevailed in the FINRA Arbitration on their argument that a determination regarding the arbitrability issue should be deferred "until there is a level playing field with respect to the evidence that is available so as to allow a true hearing on the merits of Respondents' motion,"[62] should not be permitted to assert a contrary position to this Court.

## B.  The Court Should Issue a TRO and a Preliminary Injunction.

This Court has the authority to issue a TRO immediately staying the FINRA Arbitration. *See Wachovia Sec., LLC v. Raifman,* 2010 WL 45026360, at *1 (N.D. Cal. 2010) (granting TRO and enjoining FINRA arbitration).[63] The Court also has the authority to preliminarily enjoin the FINRA Arbitration pending the resolution of Plaintiffs' complaint for declaratory and injunctive relief. *See Oppenheimerfunds Distributor, Inc. v. Liska,* 2011 WL 5984036 (S.D. Cal. Nov. 28, 2011) (granting motion for preliminary injunction to enjoin FINRA arbitration); *Raifman,* 2010 WL 45026360, at *10 (granting motion for preliminary injunction).[64] The test required for the issuance of a TRO and a preliminary injunction is the same. *See Franklin v. L.E. Scribner*, 2007 WL 1491100, *3 (S.D. Cal. 2007). A party seeking a TRO or a preliminary injunction "must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Indep. Living*

---

[60] **Exhibit "Z,"** Claimants Opposition to MTD, FINRA Arbitration, p. 13 (emphasis supplied).
[61] *See* **Exhibit "CC,"** Order dated June 27, 2012.  Although Defendants requested and received copious discovery from Plaintiffs in the FINRA Arbitration, Plaintiffs did not make a single discovery request to the Defendants, precisely because Plaintiffs object to FINRA's jurisdiction and, as such, will not avail itself of FINRA's discovery rules.
[62] **Exhibit "Z,"** Claimants Opposition to MTD, FINRA Arbitration, p. 17.
[63] *See also Brookstreet Sec. Corp. v. Bristol Air, Inc.*, 2002 U.S. Dist. LEXIS 16784, at *2 (N.D. Cal. 2002) (staying NASD arbitration because party will suffer irreparable harm); *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. Sys. Co.*, 643 F.2d 863, 868 (1ˢᵗ Cir. 1981) (holding that courts power to enjoin arbitration is derives from FAA); *Halley Optical Corp. v. Jagar Intern. Mkting. Corp.*, 52 F. Supp. 638, 639 (S.D.N.Y 1990) (holding that under the FAA "the proper procedure for a party to challenge whether it is subject to an arbitration agreement is to move the district court for a stay of arbitration.").
[64] *Herbert J. Sims & Co. v. Roven*, 548 F. Supp.2d 759, 766-67 (N.D. Cal. 2008) (same although under the NASD); *Goldman Sachs & Co. v. Becker*, No. C-07-01599, 2007 WL 1982790, at *8 (N.D. Cal. July 2, 2007) (same); *Gruntal & Co., Inc. v. Steinberg*, 837 F. Supp. 85, 93 (D. N.J. 1993) (granting preliminary injunction to bar NASD arbitration).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

*Ctr. Of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009)[65] To issue preliminary injunctive relief, the Court need *only* find a probability that necessary facts will be established, not that such facts actually exist. *Sierra On-Line  v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

As discussed below, Plaintiffs meet each of these elements.

1.    <u>Plaintiffs Are Likely To Succeed on the Merits.</u>

The first prong is easily met. As detailed below, Plaintiffs have a strong *prima facie* case that there is no basis for Defendants to compel any of the Plaintiffs to arbitration before FINRA. Under the Federal Arbitration Act ("FAA"), the district court's role when considering the issue of arbitrability is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diag. Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Generally, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000). However, where the issue arises under the first prong of the inquiry, that is, whether there exists an agreement to arbitrate, the party seeking to enforce an arbitration agreement bears the burden of showing it exists. *Alvarez v. T-Mobile USA, Inc.*, 2011 WL 6702424 (E.D. Cal. Dec. 21, 2011). In other words, courts do not apply the federal presumption in favor of arbitration when the issue goes to the "existence," rather than the "scope," of an arbitration agreement. *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006).[66] Indeed, in disputes regarding the "existence" of an arbitration agreement, the district court should order discovery and an evidentiary hearing. *See, e.g., Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999).

As described below, Plaintiffs dispute the existence of a valid and enforceable agreement between each Plaintiff and each Defendant. Accordingly, the presumption in favor of arbitration should not apply. The Court should grant a TRO and a preliminary injunction to afford the parties the time needed to conduct discovery and prepare for an evidentiary hearing in this matter.

---

[65] *Winter v. NRDC, Inc.*, 555 U.S. 7, 24-25 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (holding that the Ninth Circuit's "sliding scale" approach[65] continues to be valid after *Winter*).
[66] *See also Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 804 (N.D. Cal. 2004) (where issue is one of "existence" the court should give the party opposed to arbitration the benefit of all reasonable doubts and inferences that may arise).

15

(a)      *The Gavaldons Cannot Compel Arbitration Against Any of the Plaintiffs.*

It is undisputed that neither Mr. Gavaldon nor Mrs. Gavaldon, in their individual capacities, are signatories to an arbitration agreement with any of the Plaintiffs.[67] Absent an agreement to arbitrate, the Gavaldons can only compel arbitration against the Plaintiffs under Rule 12200 of the FINRA Code if, *inter alia,* the Plaintiffs (or were) members of FINRA and the Gavaldons are (or were) their "customers." *See* Rule 12200, FINRA Code (requiring that the dispute to be arbitrated "is between a customer and a member"). Even if, hypothetically, the Gavaldons qualify as "customers" of SCI and SCBI under the FINRA Code -- and they clearly do not --, they cannot compel arbitration against those entities because neither is a member of FINRA. *See* FINRA Rule 12200 (requiring that arbitrable disputes be between a "member" and a "customer").

Nor can the Gavaldons compel arbitration against SCSI. The Gavaldons, like S&A and Harley, were not "customers" of SCSI as of the date of the occurrence of the events giving rise to Defendants' claims, *i.e.,* when the alleged unsuitable, negligent, and/or fraudulent investment recommendations were purportedly made. This is true for the simple fact that SCSI did not become a member of FINRA until February 29, 2008, and all of the alleged investments and loans were made prior to that date. Even after SCSI became a member of FINRA, the Gavaldons still did not become SCSI's "customers." Apparently, the Gavaldons believe that because S&A and Harley eventually became "customers" of SCSI, they too acquired "customer" status and can compel arbitration against SCSI and the other Plaintiffs here. The Gavaldons are mistaken. The district court's *Raifman* decision is instructive on this point. There, two individuals who were account holders of a FINRA member argued that their customer status should be imputed to corporate entities in which they were sole members or beneficial owners. 2010 WL 4502360, *1. The only connection between the FINRA member firm and the corporate entities was that the individuals, *in their capacity as trustees for an inter vivos trust*, had an account with the FINRA member. While the trust and the trustee were indisputably customers of the FINRA member, the court found that no customer relationship could exist between the FINRA member and the corporate entities or individuals. The corporate entities' and individuals' "relationships with [the firm p]laintiffs are too

---

[67] *See* **Exhibit "Z,"** Opp. to MTD., p. 8 (describing the Gavaldons as "nonsignatories").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

1   tenuous for [p]laintiffs to reasonabl[y] expect that they would be subject to FINRA arbitration. *Id.* at *8.

2       The same is true of the Gavaldons. The only connection they have to SCSI is that they purport to

3   be the beneficial owners or grantors of the S&A and Harley trusts. However, the Gavaldons did not sign

4   any agreements with SCSI in their individual capacities. They maintained no accounts at SCSI in their

5   individual capacities. They do not allege that they purchased any securities or borrowed any loans from

6   SCSI in their individual capacities. They do not claim to have received any brokerage or investment

7   banking advice from SCSI in their individual capacities. In short, like the individuals in *Raifman*, the

8   Gavaldons' relationship with SCSI is simply too remote to permit them to compel arbitration as

9   "customers" under FINRA Rule 12200.

10          (b)      *None of the Defendants Can Compel Arbitration Against SCI.*

11      It is undisputed that there is no arbitration agreement between any of the Plaintiffs and any of the

12  Defendants. As indicated previously, absent an agreement to arbitrate, Defendants may compel

13  arbitration only if they satisfy the requirements under Rule 12200 of the FINRA Code. As it relates to

14  SCI, those requirements are not satisfied, because it is undisputed that SCI has never been a member of

15  FINRA. Therefore, without even reaching the issue of whether Defendants were (or are) "customers" of

16  SCI, the Court can easily find that SCI is not required to arbitrate with any of the Defendants.

17          (c)      *None of the Defendants Can Compel Arbitration Against SCBI.*

18      Although SCBI signed arbitration agreements with S&A and Harley, those agreements require

19  AAA arbitration.[68] Plaintiffs anticipate that Defendants will argue that the AEBI Brokerage Agreement

20  provides for arbitration before FINRA. However, that assertion is belied by the terms of the agreement.

21  The terms of the AEBI Brokerage Agreement are to be construed in accordance with their plain

22  meaning. *See Zaidi v. New York Bldg. Contractors, Ltd.*, 2012 WL 4513168, at *1 (N.Y. App. Div. Oct.

23  3, 2012) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced

24  according to the plain meaning of its terms. . . . *[C]ourts may not add terms to a contract and thereby*

25  *make a new contract for the parties under the guise of interpreting the writing*.") (emphasis added)[69].

26  _____

27  [68] *See* **Comp. Exhibit "H,"** AEBI Brokerage Agreement ¶ 6; **Exhibit "I,"** NISA ¶ 9(a).
    [69] The AEBI Brokerage Agreement is governed by New York law. This well-established principle of contract law is the same

28  under California law. *See Alan v. Superior Court*, 111 Cal. App.4th 217, 224 (2003) (stating that "arbitration provisions
    in...customer agreements are to be construed in accordance with their plain meaning").

17

1  The arbitration provision in the AEBI Brokerage Agreement provides for arbitration "before the

2  American Arbitration Association or the National Association of Securities Dealers, Inc.["NASD"] . . . .

3  "[70] Insofar as the AEBI Brokerage Agreement, by its plain and unambiguous terms does not specifically

4  mention FINRA as a potential arbitral forum, any attempt by the Defendants to vary the terms of the

5  agreement would clearly be improper.[71] In any event, even if the Court was to construe the AEBI

6  Brokerage Agreement as permitting arbitration before FINRA, Defendants still could not compel

7  arbitration against SCBI because it is not a member of FINRA.

8          (d)    *None of the Defendants Can Compel Arbitration Against SCSI.*

9       As indicated above, SCSI's previous efforts to enforce the arbitration provision in the SCSI

10  Brokerage Agreement were rejected by the AAA tribunal and federal district court in the *Calvo*

11  litigation. *See* pp. 9-10, *supra.* Recognizing that the determinations of the tribunal and district court in

12  *Calvo* created significant uncertainty concerning the validity and enforceability of the arbitration

13  provision in the SCSI Brokerage Agreement, SCSI refrained from enforcing them against S&A and

14  Harley in the FINRA Arbitration. For their part, Defendants profess to endorse the district court's

15  decision in *Calvo*;[72] however, there is an obvious contradiction between, on the one hand, Defendants'

16  stated endorsement of the district court's opinion*, and, on the other hand, Defendants' allegations in the

17  SOC. To be sure, the district court in *Calvo* found that, *inter alia,* SCSI "ha[d] failed to prove it is more

18  likely than not to prevail in showing that [SCSI] is not subject to arbitration before a AAA panel,"[73] In

19

20  [70] **Comp. Exhibit "H,"** AEBI Brokerage Agreement ¶ 6.

21  [71] There is no merit to the argument that the NASD is the same entity as FINRA for purposes of enforcing the AEBI Brokerage Agreement.  Defendants cannot dispute that the NASD no longer exists. FINRA was *created* in July 2007 through the consolidation of NASD and the member regulation, enforcement and arbitration functions of the New York Stock Exchange ("NYSE"). After the SEC approved the merger and consolidation of NASD's and the NYSE's operations, FINRA

22  appointed a new management team, a new Board of Governors, and created a new FINRA rulebook.  *See* "NASD and NYSE Member Regulation Combine to Form the Financial Industry Regulatory Authority - FINRA" (July 30, 2007) (available at FINRA's website, www.finra.org); "FINRA Announces Interim Board of Governors to Serve Until Annual Meeting for

23  Board Elections" (Aug. 2, 2007) (available at FINRA's website). Thus, the NASD Code of Arbitration for Customer Disputes -- the arbitration rules for which the parties to the AEBI Brokerage Agreement contracted -- have been replaced by

24  the FINRA Code, which applies only to cases filed after the merger of the NASD and NYSE. Because the NASD no longer exists and its rules do *not* apply to the parties dispute, the only available forum under the AEBI Brokerage Agreement is the

25  AAA. *Cf. Alan*, 111 Cal. App.4th at 230 (finding that where arbitration clause required arbitration only before the NASD, matter would have to be litigated in court if NASD was *no* longer an available forum); *Provencio v. WMA Securities, Inc.*,

26  125 Cal. App.4th 1028, 1032 (2005) (holding that once company was no longer member of NASD, arbitration by NASD was precluded absent investors' consent).

27  [72] **Exhibit "Z,"** Opposition to MTD, pp. 9-10.
[73] **Exhibit "W,"** Decision and Order p. 26.

28

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

other words, the court determined that it was unlikely that SCSI could demonstrate that the arbitration provision in the SCSI Brokerage Agreement is valid and enforceable. Yet, in their SOC, Defendants purport to compel arbitration against SCSI pursuant to that very provision.[74] Defendants cannot have it both ways and assert, as they did in their Opposition to the MTD in the FINRA Arbitration, that "[t]he issue of the binding nature of the NASD arbitration agreements in the StanChart brokerage account relationship agreements already has been decided" by the district court in *Calvo*, but then espouse a diametrically opposite position and assert that SCSI is required to arbitrate before FINRA in accordance with the SCSI Brokerage Agreements. SCSI either "assumed the [AEBI Brokerage Agreement]" and, thus, may be required to arbitrate before the AAA (as determined by the district court in *Calvo*), or it retroactively amended the arbitration provision in the AEBI Brokerage Agreement (by issuing the SCSI Brokerage Agreement), in which case SCSI may be required to arbitrate before FINRA.

Even if the Court were to find that the arbitration provision in the SCSI Brokerage Agreement was retroactively amended and became effective between SCSI and its customers (including S&A and Harley) on November 5, 2008 (as contemplated in the Retroactive Letter),[75] SCSI still would not be required to arbitrate Defendants' claims. As indicated previously, FINRA Rule 12200 requires FINRA members to arbitrate disputes only with "customers." Courts have consistently held that "[c]ustomer status…must be determined as of the time of the events providing the basis for the allegations." *Wheat, First Sec. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993) (holding that a successor broker-dealer was not required to arbitrate a dispute regarding investors' transactions conducted through its predecessor). Put another way, "[a] member may not be compelled to arbitrate where no association with the claimant existed at the time of the alleged wrongful conduct." *World Group Sec. v. Tiu*, No. CV 03-2609-NM, 2003 WL 26119461, at *5 (C.D. Cal. July 22, 2003) (citing *Wheat, First Sec.*, 993 F.2d at 820).[76]

In this case, the events giving rise to Defendants' claims are the alleged unsuitable, negligent, and/or fraudulent investment and loan recommendations by the Plaintiffs which allegedly caused Defendants to suffer losses in excess of $4 million. All of the securities purchases and loans in question

---

[74] *See* **Exhibit "A,"** SOC ¶ 38.
[75] *See* **Exhibit "P,"** Retroactive Letter.
[76] *See also Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1288 (11th Cir. 2002) (status of association with a member must be determined at the time of the event giving rise to the dispute or claim).

19

were made prior to November 5, 2008 -- the effective date of the SCSI Brokerage Agreement. Based on this factual predicate, the Court is compelled to find that Defendants were **_not_** "customers" of SCSI "as of the time of the events providing the basis for the allegations." *Wheat, First*, 993 F.2d at 820-21. None of the Defendants was a customer of SCSI prior to November 5, 2008, and SCSI had not agreed to arbitrate any disputes with any of the Defendants prior to November 5, 2008. Accordingly, Defendants were not SCSI's "customers," as of the time of the events that constitute the factual predicate for the causes of action in their SOC.

In *Prudential Sec., Inc. v. Dusch*, No. 931470-IEG (RBB), 1994 WL 374425 (S.D. Cal. Mar. 28, 1994) the customer sought damages from Prudential based upon allegations that investments recommended to her were unsuitable in light of her investment objectives. *Id.* at *1. The customer claimed damages based upon certain investments she had made at another broker-dealer prior to becoming a Prudential customer. *Id.* The customer maintained that when her account was transferred from her prior broker-dealer to Prudential, Prudential assumed the predecessor broker-dealer's obligations to arbitrate any claims related to those investments. *Id.* Prudential denied that it was required to arbitrate disputes arising before the time the customer's account was transferred to Prudential. *Id.* *2.

The court agreed with Prudential and ruled that Prudential was not required to arbitrate any claims arising before the customer became Prudential's "customer." *Id.* "[A]t the time [the customer's] account was transferred to Prudential, the documentation relating to her account was assumed by Prudential. The arbitration agreement did not become binding upon Prudential until it became a party to the agreement, on September 1, 1989, when [the customer's] account was transferred. Therefore, it had not agreed to arbitrate disputes relating to events prior to that date." *Id.* The court explained that the requirement under the NASD Code (like current FINRA Code) that a member arbitrate claims upon demand of the customer, did not apply prior to the transfer of the customer's account to Prudential. "Prior to her becoming a customer of Prudential, there was no agreement to arbitrate."

The same result should issue here. To the extent the arbitration provisions in the SCSI Brokerage Agreements are valid and enforceable, they did not become binding upon SCSI until the agreement became effective on November 5, 2008. Accordingly, SCSI is not required to arbitrate any disputes relating to Defendants' investments at SCBI prior to that date.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

1    Because Defendants were not "customers" of SCSI at the time the investments and securities at

2    issue were made , it is not surprising that their claims have nothing to do with, and thus, do not "arise[]

3    in connection with" SCSI's "business activities." Rule 12200, FINRA Code. As a preliminary matter,

4    the alleged recommendations upon which Defendants' claims are based occurred prior to the date (*i.e.,*

5    February 29, 2008) that SCSI became a member of FINRA. Thus, the parties' dispute does not "arise[]

6    in connection with the business activities of a member," because SCSI was not a member of FINRA

7    when the alleged recommendations were purportedly made. Moreover, there is not a scintilla of

8    evidence that the alleged recommendations or investments in dispute have any material connection to

9    the "business activities" of SCSI. To be sure, the alleged recommendations and investments were made

10   between January 2003 and January 2008, that is, several months, and, in most cases, *years*, before SCSI

11   opened for business (on November 5, 2008). *See World Grp. Sec.*, 2003 WL 26119461, at *4-*5

12   ("Defendant's arbitration cannot arise in connection [p]laintiff's business" because claims arose out of

13   events "some two years before Plaintiff came into existence and became an NASD member").

14   Plaintiffs anticipate that Defendants may try to force arbitration by means of various arguments

15   that arbitrability is somehow not controlled by FINRA "customer" status at the time of the events giving

16   rise to their claims, but rather, as of the dates of subsequent events. In their Opposition to MTD in the

17   FINRA Arbitration, Defendants asserted that "Respondents are liable not only because of their failure to

18   conduct any, or any sufficient, due diligence, but also because they failed to meet their express promises

19   to monitor those recommended investments in such a manner as to protect the Gavaldons. (*See*

20   Amended Statement of Claim, ¶¶ 6-10). Thus, the relevant 'time of the events' is from the dates of the

21   investment recommendation to purchase Fairfield Sentry and at all times thereafter."[77] This argument is

22   the quintessential "red herring." Putting aside the fact that Defendants fail to proffer any evidence

23   whatsoever to demonstrate that any alleged "promise to monitor" was actually made by any of the

24   Plaintiffs, the allegations in the SOC that are cited by the Defendants in support of the supposed

25   "promise to monitor," pertain to S&A's and Harley's account relationship with SCBI -- not SCSI.

26   Clearly, those allegations are irrelevant to the issue of "customer" status under FINRA Rule 12200,

27

28   [77] **Exhibit "Z,"** Opposition to MTD, p. 12 (emphasis in original).

21

1   because SCBI is not a member of FINRA and is not subject to FINRA Rule 12200.

2          Defendants also may argue that their purported claims pertain to SCSI's failure to monitor or

3   supervise the securities activities of its "associated persons," including Luisa Serena or Ray Garnica, are

4   sufficient to establish the arbitrability of all of their claims. But, the mere assertion of such allegations is

5   insufficient to establish arbitrability where the events that give rise to the defendants' claims occurred at

6   a time when the "associated person" was, in fact, not associated with the broker-dealer, and when, as

7   here, there is no legal basis for such claims. For example, if, as in *Hornor, Townsend & Kent, Inc. v.*

8   *Hamilton*, 2005 WL 5895396, *2 (N.D. Ga. 2005), the actual events giving rise to an investor's claims

9   occurred before the representative became associated with the FINRA member, then the inclusion of

10  lack of supervision allegations cannot save an otherwise non-arbitrable claim. The court rejected

11  arbitrability on the investor's failure to supervise claims because the alleged misrepresentations or

12  omissions that induced the investors' investment decisions (at least as to one of the investments in

13  question) occurred before the representative became associated with the broker-dealer. The court aptly

14  stated: "[O]n August 2, 1999, Tommy Fountain was not employed by [the NASD member], although he

15  was so employed on October 1, 1999. Clearly if the sale occurred at a time when Tommy Fountain was

16  not employed by [the NASD member], the latter cannot be hauled into an arbitration proceeding

17  convened to adjudicate the [customers'] complaint about the propriety of the sale."

18         The same is true here. The alleged unsuitable, negligent, and/or fraudulent recommendations

19  were made prior to the date that either Ms. Serena or Mr. Garnica became registered representatives of

20  SCSI in February 2008 June 2008, respectively.[78] In fact, it was not until November 5, 2008, when SCSI

21  began conducting its securities business that SCSI actually acquired responsibility for supervising the

22  "securities activities" of Ms. Serena and Mr. Garnica.[79] Prior to November 5, 2008, SCSI was exempt

23  from supervising the "securities activities" of SCBI employees who, like Ms. Serena and Mr. Garnica,

24  _____

25  [78] **Composite Exhibit "U,"** BrokerCheck Reports for Luisa Serena, Ray Garnica, and Carlos Gadala Maria.  Incidentally, Gadala-Maria, whom Defendants allege made most of the investment recommendations in dispute, was never a registered representative of SCSI.  *See* **Composite Exhibit "U,"** BrokerCheck Report for Carlos Gadala-Maria.

26  [79] Pursuant to a Networking Agreement between SCSI and SCBI, which became effective on November 5, 2008, SCBI

27  agreed to lease office space to SCSI for the purpose of having SCSI establish "investment centers" on SCBI's premises through which SCSI could conduct "investment services".  In accordance with that agreement, SCSI assumed responsibility for supervising the "securities activities" of "dual employees" of SCSI and SCBI (*i.e.,* "SCSI Representatives") while he or

28  she is providing "investment services at an investment center."  *See* **Exhibit "T,"** Networking Agreement.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

1  became registered representatives of SCSI during the implementation period of the broker "push-out"

2  provisions under the GLBA. In a series of interpretive letters published by the NASD staff, the NASD

3  recognized that during the GLBA phase-in period, NASD member firms would be permitted to sponsor

4  the registration of employees of the member's bank affiliate(s) whom the member intended to employ

5  prospectively in its securities business."[80] According to the NASD staff, "so long as bank employees

6  continue to be supervised by the bank and do not engage in any securities activity for or on behalf of the

7  member firm of which they are an associated person, a member will not be required to separately

8  supervise such associated persons under Rules 3010, 3030, 3040 or 3050." Therefore, not only were Ms.

9  Serena and Mr. Garnica not "associated persons" of SCSI when the events giving rise to Defendants'

10  claims are alleged to have occurred, but, they did not become subject to SCSI's supervision until several

11  months later.

12      In view of all of the foregoing, there is little doubt that Plaintiffs are likely to prevail on their

13  claims that Defendants' claims are not arbitrable. This strong likelihood of success, coupled with the

14  irreparable harm that Plaintiffs will suffer in the absence of a TRO and a preliminary injunction, entitles

15  Plaintiffs to the relief requested.

16      2.    <u>Plaintiffs Will Suffer Irreparable Harm Without a TRO or a Preliminary Injunction.</u>

17      It is well-settled that a party suffers *per se* irreparable harm if it is forced to spend time and

18  money arbitrating when it has not agreed to do so. *See Merrill Lynch Inv. Mgrs. v. Optibase Ltd.,* 337

19  F.3d 125, 129 (2d Cir. 2003); *Gruntal*, 837 F. Supp. at 93 (holding that "compelling [a broker-dealer] to

20  appear in the Arbitration Proceedings [although it has not agreed to arbitrate] would constitute *per se*

21  irreparable harm for the purposes of the preliminary injunction analysis").[81] Should the FINRA

22  Arbitration proceed, Plaintiffs will undoubtedly suffer irreparable harm; therefore, the Court should

23  grant Plaintiffs' request for a TRO and a preliminary injunction.

24

25  [80] **Exhibit "Q,"** Letter from Gary Goldsholle to Alan E. Sorcher, Securities Industry Association, and Sarah Miller, American Bankers Association and ABA Securities Association, dated Oct, 27, 2000; **Exhibit "R,"** Letter from Gary

26  Goldsholle to Alan E. Sorcher responding to Letter from Scorcher dated June 22, 2004; **Exhibit "S,"** Letter from Gary Goldsholle to Alan E. Sorcher, Securities Industry Association, and Sarah Miller, ABA and ABA Securities Association, dated December 12, 2005.

27  [81] *See also Textile Unlimited, Inc. v. A.BMH & Co., Inc.,* 240 F.3d 781, 786 (9th Cir. 2001) (finding that plaintiff would have no adequate remedy at law if wrongfully compelled to arbitrate); *Raifman*, 2010 WL 4502360, at * 10; *Sykes v. Escueta*, No.

28  10-3858, 2010 WL 4942608, at *4 (N.D. Cal. Nov. 29, 2010).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

3.      The Balance of the Equities Tips Sharply in Favor of the Plaintiffs.

A balancing of the equities overwhelmingly favors issuing a TRO and a preliminary injunction. If the court does not issue a TRO and preliminarily enjoin the Defendants from proceeding in the FINRA Arbitration, Plaintiffs will suffer irreparable harm as described above. On the other hand, if the court issues a TRO and a preliminary injunction, Defendants are not likely to suffer any harm because they can ultimately bring their claims in front of a court of competent jurisdiction or before the AAA. At most, Defendants will only suffer a delay in litigating their claims. Defendants will likely argue that the harm to them caused by a delay of the arbitration proceeding would be just as great, in particular, because Mr. Gavaldon is 83 years of age. In response to a nearly identical argument, a court in this federal district previously declared: "This argument [that a delay of the arbitration proceeding will cause great harm to the defendant who is an elderly man in his eighties] . . . assumes that arbitration is the proper forum for his claims. The Court has found that [defendants'] claims are not likely arbitrable. Consequently, allowing such an arbitration proceeding to proceed would not benefit [the defendant], as the arbitration award may be ultimately set aside by the Court" *Liska*, 2011 WL 5984036, at *5. It should be noted that Defendants already waited as much as nine years before bringing a claim on some of the transactions at issue, *e.g.,* their 2003 loans, in the FINRA Arbitration. A further slight delay is not likely to cause Defendants any major harm.

4.      The Issuance of a TRO and a Preliminary Injunction is in the Public Interest.

"One of the threads running through [all of] federal arbitration jurisprudence is the notion that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotations omitted). Thus, while there is a strong federal policy to enforce arbitrations agreements, "the Supreme Court has 'never held that this policy overrides the principle that a court may submit to arbitration only those disputes that the parties have agreed to submit.'" *Liska*, 2011 WL 5984036, at *6. Where, as here, a party did not agree to submit to arbitration, courts in the Ninth Circuit have held that an injunction is in the public interest. *See, e.g., Raifman*, 2010 WL 4502360, at *10; *Sykes*, 2010 WL 4942608, at *5. Accordingly, this final factor tips in Plaintiffs' favor.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

**C.**   **The Court Must Sever and Enjoin Those Claims That Are Not Arbitrable.**

It is well settled that when certain claims are arbitrable but others are not, a court must sever the non-arbitrable claims before compelling arbitration. *See, e.g., Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464-65 (9th Cir. 1983) (ordering arbitration of certain claims but severing, for judicial determination, claims "that are either primarily or wholly outside the scope of the arbitration clause").[82] Here, Defendants ask the Court to simply "lump" all of their claims together, irrespective of the actual allegations of wrongdoing against each of the Plaintiffs and without considering the timing of relevant events giving rise to each claim. At a minimum, non-arbitrable claims include all claims against SCI, as well as, all claims for which no written arbitration agreement exists.

**D.**   **Plaintiffs Should Not Be Required To Post A Bond.**

The TRO and injunctive relief sought by Plaintiffs would merely halt Defendants from proceeding with an arbitration proceeding to which Plaintiffs never agreed. Defendants' substantive rights of claim against Plaintiffs will remain unaffected, and Plaintiffs can pursue any viable claims they may have in court or the AAA should they choose to do so. Although ultimate determination of Defendants' claims might be delayed slightly by injunctive relief, that delay would not result in any damages to Defendants. The time value of money could potentially be recovered in the form of prejudgment interest as part of any possible award compensatory damages if Defendant were to prevail on their claims. Moreover, Defendants do not have to pay any filing fees to respond to Plaintiffs' complaint and motions for a TRO and injunctive relief. Accordingly, Defendants will not incur any costs or damages to abide by a TRO or a preliminary injunction in this Court. For that reason, this Court should not require Plaintiffs to post any security for injunctive relief.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Plaintiffs' Motion for Temporary Restraining Order and Motion for Preliminary Injunction.

---

[82] *Paine Webber, Inc. v. Hofmann,* 984 F.2d 1372, 1377 (3d Cir. 1993) (vacating and remanding the district court's order to arbitrate because the lower court was "flawed" in its "assumption that there was a single, indivisible claim."); *Collins & Aikman Products Co. v. Building Systems, Inc.,* 58 F.3d 16, 20 (2d Cir. 1995) ("If some claims are non-arbitrable, while others are arbitrable, then we will sever those claims subject to arbitration from those adjudicable only in court.").

DATED: October 22, 2012                   Respectfully Submitted,

                                          GREENBERG TRAURIG, LLP


                                          By: _____/s/ Jeffrey F. Yee._____
                                                 Jeffrey F. Yee

                                          GREENBERG TRAURIG, P.A.

                                          By:_____/s/ Ricardo A. Gonzalez___
                                                 Ricardo A. Gonzalez

                                          By: _____/s/ Jonathan J. Rodriguez___
                                                 Jonathan J. Rodriguez

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

I am employed in Miami-Dade County, State of Florida; I am over the age of 18 years and not a party to the within action; my business address is Greenberg Traurig, P.A., 333 S.E. 2nd Avenue, Suite 4400, Miami, FL 33131.

On October 22, 2012, I served the Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order and Motion for Preliminary Injunction on the interested parties in this action by placing the true copy thereof, enclosed in a sealed envelope, postage prepaid, addressed as follows:

Robert M. Traylor

James P. Delphey

SELTZER CAPLAN McMAHON VITEK

2100 Symphony Towers

750 B Street

San Diego, CA 92101

traylor@scmv.com

delphey@scmv.com

☐ **(BY MAIL)**

☐ I deposited such envelope in the mail at Miami, Florida.  The envelope was mailed with postage thereon fully prepaid.

☐ I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service.  The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at Miami, Florida, in the ordinary course of such business.

☒ **(BY FEDERAL EXPRESS)**

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for delivery by Federal Express.  Under the practice it would be deposited with Federal Express on that same day with postage thereon fully prepared at Miami, Florida, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if delivery by Federal Express is more than one day after date of deposit with Federal Express.

☒ **(BY ELECTRONIC MAIL)** Per the parties' agreement, the foregoing document was served electronically by electronically mailing a true and correct copy through Greenberg Traurig, PA's electronic mail system to the e-mail addressees, as set forth above, and the transmission was reported as complete and no error was reported.

☒ **(FEDERAL)** I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 22, 2012, in <u>Miami</u>, Florida.

_____
Ricardo A. Gonzalez

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION